**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| OTG NEW YORK, INC., <br><br> Plaintiff, <br><br> v. <br><br> OTTOGI AMERICA, INC., <br><br> Defendant. | Case No. 2:24-cv-07209 (BRM)(JRA) <br><br><br> **OPINION** |

**MARTINOTTI, DISTRICT JUDGE**

Before the Court is Defendant Ottogi America, Inc.'s ("Ottogi") Motion to Dismiss (ECF No. 12) Plaintiff OTG New York's ("OTG") Complaint (ECF No. 1) pursuant to Federal Rule of Civil Procedure 12(b)(6). OTG filed an Opposition on August 26, 2024 (ECF No. 13), and Ottogi filed a Reply on September 9, 2024 (ECF No. 14). Having reviewed the submissions filed in connection with the Motion and having declined to hold oral argument pursuant to Fed. R. Civ. P. 78(b), for the reasons set forth below and for good cause having been shown, Ottogi's Motion to Dismiss is **DENIED**.

**I.    BACKGROUND**

For the purpose of this Motion to Dismiss, the Court accepts the factual allegations in the Complaint as true and draws all inferences in the light most favorable to OTG as the nonmoving party. *See Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008). The Court also considers any "document integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

1

### A. Factual Background

OTG is owned by Mr. Soonsik Choi and is a distributor of Ottogi's, selling only Ottogi's products since 2008. (ECF No. 1 ¶¶ 1, 21.) Ottogi is wholly owned by and is a subsidiary of Korean company Ottogi Corporation, for whom Ottogi sells its food products directly in the United States, except for the sales through OTG. (*Id.* ¶ 2.) OTG has invested in marketing, advertising, and customer relations for throughout this relationship. (*Id.* ¶ 22.) OTG's yearly sales reached over $15 million in 2023. (*Id.*) OTG alleges that the nature of this relationship makes OTG a franchisee of Ottogi. (*Id.* ¶ 56.)

Ottogi's management regularly traveled to New York during its business relationship with OTG to negotiate agreements and strategize on how to increase Ottogi's presence in the Northeast. (*Id.* ¶ 29.) Ottogi also directed shipment of millions of dollars in inventory to OTG's warehouse in New Jersey. (*Id.*)

Ottogi solicited OTG to serve as the North American East Coast distribution arm for Ottogi's products beginning in 2008, which resulted in the execution of a Distributor Agreement (the "Agreement") between the parties. (*Id.* ¶ 3.) The Agreement was for an indefinite term and was based on mutual trust between OTG's principal, Mr. Choi, and Ottogi, including Ottogi's parent corporation in Korea. (*Id.* ¶ 4.) Ottogi granted OTG the exclusive right to distribute Ottogi's products in New York, New Jersey, Maryland, Pennsylvania, Virginia, Massachusetts, and in Canada, which included the right to use Ottogi's trademarks, logos, and designs to facilitate the sales of Ottogi products. (*Id.* ¶ 52.)

OTG expanded its sales to Amazon in 2015, and its Amazon sales reached over $1.3 million in 2020. (*Id.* ¶ 44.) In March 2021, Ottogi also entered the Amazon marketplace, listing products at much higher prices, which OTG then matched. (*Id.* ¶ 46.) In April 2021, Ottogi

dropped its prices, which OTG matched as well, leading to an average operating loss of 40% for its online sales. (*Id.* ¶¶ 46–47.) OTG then invested in various marketing and operational expenses to increase its presence on Amazon. (*Id.* ¶ 48.)

OTG invested millions of dollars to: (1) stock Ottogi parts and inventory for resale; (2) hire qualified personnel to coordinate Ottogi's North American distribution operations; (3) promote Ottogi's brand through advertisements; and (4) prepare a warehouse to store Ottogi's inventory for customers. (*Id.* ¶ 53.) Over the span of the Agreement, from 2008 to 2023, OTG sold over $132 million in Ottogi products. (*Id.* ¶ 6.) Throughout the course of the Agreement, 100% of OTG's revenues were attributable to the sale of Ottogi products. (*Id.* ¶ 53.)

The parties stipulated in the Agreement that no franchise relationship existed between them, and that OTG would have sole control over the marketing, naming, packaging, labeling, and advertising of the products:

> **Powers as Distributor.** No franchise is granted in this Agreement. Except as expressly provided in this Agreement, all aspects of the distribution and marketing of the Products by the Distributor will be in the Distributor's sole control, including without limitation the methods of marketing, pricing, naming, packaging, labeling, and advertising, and the terms and conditions of any sale, unless otherwise provided for in this Agreement.
>
> . . .
>
> **Supplier and Distributor as Independent Contractors**. The Supplier and the Distributor agree that their relationship is that of the seller and the buyer (or the licenser and the licensee) and not that of joint venturers, principals or agents, or franchiser and franchisee. Both are independent contractors acting for their own accounts, and neither is authorized to make any commitment or representation,

> express or implied, on the other's behalf unless authorized to do so by the other in writing.

(ECF No. 12-1 at 12.)[1]

Before OTG filed the June 2024 Complaint, Ottogi enacted price increases that strained OTG's financial resources and operational capacity. (*Id.* ¶ 7.) After this price increase, OTG increased its own prices, leading to a significant loss of customers and market share. (*Id.*) Ottogi did not provide support or deliver products in a timely fashion after these price increases. (*Id.* ¶ 31.) Ottogi then issued an early 2024 Termination Notice, citing OTG's alleged breaches of the Agreement, including failure to comply with payment terms, then informed OTG that the Agreement would cease on May 31, 2024. (*Id.* ¶ 36.) The Termination Notice did not include a provision allowing OTG to cure its alleged breaches. (*Id.* ¶ 37.) OTG continued to advertise Ottogi products by sending in-person advertisers to supermarkets and increasing infrastructure to support the distribution of Ottogi products. (*Id.* ¶ 33.)

On June 24, 2024, OTG sued Ottogi alleging, *inter alia*, breach of contract. After the initiation of this litigation, Ottogi contacted OTG's dealer-customers[2] to sell to them directly instead of passing through OTG. (*Id.* ¶ 15.) Also after termination of the Agreement, Ottogi would not sell or deliver products that were previously sold through OTG. (*Id.* ¶ 43.)

### B.   Procedural Background

On June 24, 2024, OTG filed a six-count Complaint against Ottogi, alleging (1) unfair and deceptive business practices, including a violation of the New Jersey Franchise Act (N.J. Stat.

---

[1] This Court considers the Agreement to be a "document integral to or explicitly relied upon in the complaint" and cites its language throughout this Opinion. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

[2] Dealer-customers purchase Ottogi products from OTG in cities on the East Coast and then resell the products to their final customers. (ECF No. 1 ¶ 25.)

4

§ 56:10-3(a)), which prohibits franchisors from terminating a franchise relationship without good cause and without providing the franchisee a reasonable opportunity to remediate alleged deficiencies (ECF No. 1 ¶¶ 55–56); (2) breach of contract for Ottogi's termination of the Agreement (*Id.* ¶ 6); (3) tortious interference with business relations, for adopting OTG's businesses and customers without compensation (*Id.* ¶ 66); (4) promissory estoppel, as OTG reasonably, foreseeably, and detrimentally relied on Ottogi's promises regarding the length and nature of the Agreement (*Id.* ¶¶ 70–72); (5) unjust enrichment, as OTG invested resources in establishing Ottogi's brand, without compensation after termination of the Agreement (*Id.* ¶¶ 75–76); and (6) declaratory judgment that Ottogi's termination of the Agreement was unlawful and that OTG remains the exclusive distributor of Ottogi's products on the East Coast (*Id.* ¶ 81).

On August 15, 2024, Ottogi moved to dismiss OTG's Complaint. (ECF No. 12.) OTG filed an Opposition on August 26, 2024 (ECF No. 13), and Ottogi filed a Reply on September 9, 2024 (ECF No. 14).

## II.   LEGAL STANDARD

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), a district court is "required to accept as true all factual allegations in the complaint and draw all inferences from the facts alleged in the light most favorable to [the non-moving party]." *Phillips*, 515 F.3d at 228. "[A] complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citations omitted). However, "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." *Id.* (alterations in original). A court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain,* 478 U.S. 265, 286 (1986). Instead,

assuming factual allegations in the complaint are true, those "[f]actual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555.

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 663 (citing *Twombly*, 550 U.S. at 556). This "plausibility standard" requires the complaint allege "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "[D]etailed factual allegations" are not required, but "more than an unadorned, the-defendant-unlawfully-harmed-me accusation" must be pled; it must include "factual enhancements" and not just conclusory statements or a recitation of the elements of a cause of action. *Id.* (citations omitted). In assessing plausibility, the court may not consider any "[f]actual claims and assertions raised by a defendant." *Doe v. Princeton Univ.*, 30 F.4th 335, 345 (3d Cir. 2022).

"Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* (quoting Fed. R. Civ. P. 8(a)(2)). Indeed, after *Iqbal*, it is clear that conclusory or "bare-bones" allegations will no longer survive a motion to dismiss: "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. To prevent dismissal, all civil complaints must

6

now set out "sufficient factual matter" to show that the claim is facially plausible. This "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. The Supreme Court's ruling in *Iqbal* emphasizes that a plaintiff must show that the allegations of his or her complaints are plausible. *See id.* at 670.

While, as a general rule, the court may not consider anything beyond the four corners of the complaint on a motion to dismiss pursuant to Rule 12(b)(6), the Third Circuit has held that "a court may consider certain narrowly defined types of material without converting the motion to dismiss [to one for summary judgment pursuant to Rule 56]." *In re Rockefeller Ctr. Props. Sec. Litig.*, 184 F.3d 280, 287 (3d Cir. 1999). Specifically, courts may consider any "document *integral to or explicitly relied upon* in the complaint." *In re Burlington Coat Factory*, 114 F.3d at 1426 (emphasis added) (quoting *Shaw*, 82 F.3d at 1220). However, "[w]hen the truth of facts in an 'integral' document are contested by the well-pleaded facts of a complaint, the facts in the complaint must prevail." *Princeton Univ.*, 30 F.4th at 342.

### III. DECISION

Ottogi argues OTG's Complaint should be dismissed for failure to state a claim upon which relief may be granted, pursuant to Fed. R. Civ. P. 12(b)(6). (ECF No. 12-4.) Specifically, Ottogi argues the Complaint fails to state a claim because: (1) no franchise was established under the New Jersey Franchise Practices Act's ("NJFPA") definition, so the purported NJFPA violations fail to state a claim upon which relief can be granted; and (2) the remaining allegations of the complaint must be adjudicated in the Superior Court of Los Angeles, California, pursuant to the Agreement's mandatory forum selection clause. (*Id.*) In opposition, OTG contends: (1) the NJFPA applies to this case because the parties' relationship meets the definitional requirements of existence of a license to use the franchisor's trademark and a shared community of interest between the parties;

(2) the forum-selection clause is invalid; (3) the Complaint adequately states a claim for relief regarding the remaining counts. (ECF No. 13.) In reply, Ottogi submits that (1) the NJFPA franchise definition was not met because OTG cannot establish the "license" or "community of interest" requirements under the NJFPA; and (2) the forum-selection clause naming the Superior Court of California, Los Angeles is valid and enforceable. (ECF No. 14.)[3]

### A. Existence of a Franchise under the NJFPA

Ottogi contends that the nonexistence of a franchise relationship between the parties precludes any violation of the NJFPA. (ECF No. 12-4.) Specifically, Ottogi alleges OTG cannot establish (1) the existence of a license within the meaning of the NJFPA; or (2) a "community of interest" as required to state a claim under the NJFPA. (*Id.* at 6, 9.) OTG contends its Complaint alleges that OTG made substantial investments in reliance on the Agreement, and that Ottogi's wrongful termination of the Agreement deprived OTG of its guaranteed rights and benefits, such as exclusivity. (ECF No. 1 ¶ 57.) Furthermore, OTG states that the Agreement included a comprehensive license granting OTG to extensively utilize Ottogi's trademarks, thus tethering OTG's success to Ottogi's brand recognition. (ECF No. 13 at 5.) OTG maintains that its entire business model relied on the distribution of Ottogi's products, explicitly merging the companies' interests. (*Id.* at 6.) This Court agrees with OTG.

The NJFPA defines a "franchise" as:

> a written arrangement for a definite or indefinite period, in which a person grants to another person a *license* to use a trade name, trade mark, service mark, or related characteristics, and in which there is

---

[3] Ottogi also contends in its reply that OTG addresses issues not before the Court: (1) the sufficiency of pleading Counts II–VI, and (2) the possibility of forum transfer.

8

> a *community of interest* in the marketing of goods or services at wholesale, retail, by lease, agreement, or otherwise.

N.J. Stat. § 56:10-3(a) (emphasis added). Thus, definitions of "license" and "community of interest" under the NJFPA are consequential. The Court addresses each below.

Before a party may be considered a "franchisee" within the NJFPA's protections, it must show that it has been granted a "license to use a trade name, trade mark, service mark, or related characteristic[]." N.J. Stat. Ann. § 56:10-3a. According to the New Jersey Supreme Court, "[n]ot every grant of permission to use a trademark in the sale of goods or services is a 'license' within the meaning of the [NJFPA]." *Instructional Sys., Inc. v. Computer Curriculum Corp.*, 614 A.2d 124, 138 (1992). "License" means, "at a minimum," the franchisee uses the name of the franchisor in a way that "create[s] a reasonable belief on the part of the consuming public that there is a connection between the . . . licensor and the licensee by which the licensor vouches, as it were, for the activity of the license [sic]." *Cooper Distrib. Co. v. Amana Refrigeration*, 63 F.3d 262, 272 (3d Cir. 1995) (quoting *Instructional Sys.*, 614 A.2d at 138).

The NJFPA also requires a franchisee to show that it shares a "community of interest" with the franchisor. N.J. Stat. Ann. § 56:10-3a. The New Jersey Supreme Court has clarified that:

> Community of interest exists when the terms of the agreement between the parties or the nature of the franchise business requires the licensee, in the interest of the licensed business's success, to make a substantial investment in goods or skills that will be of minimal utility outside the franchise.

*Cooper*, 63 F.3d at 269 (quoting *Instructional Sys.*, 614 A.2d at 142).[4]

Importantly, the parties' own definition of their relationship is not dispositive. *See Instructional Sys.*, 614 A.2d at 340. In determining whether a relationship constitutes a franchise,

---

[4] In *Cooper*, the Third Circuit reviewed a district court order denying a post-trial Rule 50(b) motion for judgment as a matter of law, requiring the court to determine "whether the evidence and justifiable inferences most favorable to the prevailing party afford any rational basis for the

9

"the entire course of dealings between the parties" is consequential: "[A] relationship described by the parties as a 'franchise' will not be covered by the rule unless it meets the definitional criteria of the rule; conversely, a self-described 'distributorship' will be covered by the rule if the definitional elements are satisfied." *Id.* (citations omitted). Accordingly, and despite the language in the Agreement disclaiming the existence of a franchise, the Court will independently evaluate the parties' relationship based on the allegations in the Complaint.

### 1. A License Exists Between the Parties Under the NJFPA

Ottogi contends that the "license" requirement of the NJFPA does not encompass the word's broadest sense, but rather is confined only to when the franchisee presents himself with the trade name of the franchisor, capitalizing on the franchisor's public goodwill. (ECF No. 12-4 at 6–7.) OTG counters that its use of Ottogi's trademarks rose far above superficiality, as its entire business model revolved around Ottogi's brand, making the Ottogi trademark essential to its operations, thereby satisfying the NJFPA's "license" requirement. (ECF No. 13 at 5.) Based on the allegations in the Complaint, OTG's position is correct.[5]

Ottogi primarily relies on *Colt Indus. v. Fidelco Pump & Compressor Corp.*, 844 F.2d 117 (3d Cir. 1988), in contending that the Agreement's restrictions on OTG's use of Ottogi's brand names preclude the granting of a license. (ECF No. 12-4 at 8.) In *Colt*, the court found that a trademark license was not granted where the distributor (Fidelco) could use the manufacturer's

---

verdict." *Id.* at 269. Here, the Court relies on *Cooper* for the elements of a NJFPA claim but applies the motion to dismiss standard, which tests the legal sufficiency of the complaint and requires the Court to accept all well-pleaded allegations as true, drawing all reasonable inferences in favor of OTG.

[5] This Court accepts the allegations in OTG's Complaint as true. Based on those allegations, OTG has sufficiently stated a claim. This Court does not make any findings of fact at this stage in the proceedings.

(Colt) name only in a limited sense, and that the Colt brand name could not be used in Fidelco's business name. *Colt*, 844 F.2d at 120. The Colt brand name was to be used only in a manner consistent with Colt's advertising policies. *Id.* The court cautioned against finding the existence of a license under these limited circumstances because "then any business selling a name brand product would, under New Jersey law, necessarily be considered as holding a license." *Id.*

But in this case, the relationship between the parties is more analogous to the relationship between the parties in *Neptune T.V. & Appliance Serv., Inc. v. Litton Microwave Cooking Prods. Div., Litton Sys., Inc.*, 46 A.2d 595 (N.J. Super. Ct. App. Div. 1983), which was distinguished in *Colt*, 844 F.2d at 120, based on its more elaborate agreement and the fact that nearly 50% of the distributor's (Neptune) business derived from its work with the manufacturer's (Litton) products. The court found that a license existed based on Litton's designation of Neptune as an authorized service center and its authorization to Neptune to advertise itself as such. *Neptune*, 46 A.2d at 599. This action "induced the consuming public to expect from Neptune a uniformly acceptable and quality controlled service endorsed by Litton itself," and therefore "Litton's authorization to Neptune to use the Litton name was sufficient to constitute a license as contemplated by the Act." *Id.*

This case involves facts similar to *Neptune* and is therefore distinguishable from *Colt* by the court's own language. Here, 100% of OTG's business derived from its work with Ottogi's products, compared to the under 50% of Neptune's business derived from Litton's products found

11

notable by the court in *Neptune*, 46 A.2d at 599. Viewing these facts in the light most favorable to plaintiff for the purpose of this motion, the Court finds OTG established the existence of a license.

### 2. The Parties Share a Community of Interest Under the NJFPA

Ottogi posits that OTG cannot establish a "community of interest" under the NJFPA. (ECF No. 12-4 at 9.) Ottogi cites *Golden Fortune Imp. Ex. Corp. v. Mei-Xin, Ltd.*, 2022 U.S. App. LEXIS 23007 at *8–9 (3d Cir. 2022), alleging that OTG cannot meet the "vulnerability" factors that give rise to a community of interest: (1) licensor's control over the licensee; (2) the licensee's economic dependence on the licensor; (3) disparity in bargaining power; and (4) the presence of a franchise-specific investment by the licensee. (ECF No. 12-4 at 9.) OTG counters that its significant investments in reliance on its relationship with Ottogi, and the fact that its entire business was dedicated to the distribution of Ottogi's products, establish a community of interest. (ECF No. 13 at 6.)

In *Cooper*, the court explained that the purpose of this NJFPA requirement is to protect franchisees, who "cannot do anything that would risk termination, because that would result in a loss of much or all of the value of its franchise-specific investments," giving it "no choice but to accede to the demands of the franchisor, no matter how unreasonable these demands may be." 63 F.3d at 269 (quoting *Instructional Sys.*, 614 A.2d at 141). In order for a "community of interest" to exist, "two requirements must be met: (1) the distributor's investments must have been 'substantially franchise-specific' . . . and (2) the distributor must have been required to make these

investments by the parties' agreement or the nature of the business." *Id.* (quoting *Instructional Sys.*, 614 A.2d at 141; *N.J. Am., Inc. v. Allied Corp.*, 875 F.2d. 58, 64 (3d Cir. 1989)).

### a. Franchise specificity

A finding of substantial franchise-specificity depends on whether the franchisee's investments were "useful beyond the relation the contract in question created." *See id.* at 270 (citing *Cassidy Podell Lynch, Inc. v. Snydergeneral Corp.*, 944 F.2d 1131, 1144 (3d Cir. 1991)). Efforts to obtain knowledge related to the franchise may constitute a franchise-specific investment. *Cooper*, 63 F.3d at 270. Goodwill may also constitute a franchise-specific asset only where it is "useful for the alleged franchisee only in the context of its relationship with the alleged franchisor," and does not extend to other manufacturers contracting with the franchisee. *Id.* The franchisee's investments in tangible assets are also relevant, as the "NJFPA protects franchise-specific 'tangible capital investments, such as a building designed to meet the style of the franchise, special equipment useful only to produce the franchise product, and franchise signs." *Id.* at 271 (quoting *Instructional Sys.*, 614 A.2d at 141).

In *Cooper*, the Third Circuit found that substantial franchise specificity existed, noting, after discovery, that (1) Cooper significantly invested in the acquisition of knowledge about the franchisor's products, (2) Cooper generated franchise-specific goodwill, (3) Cooper had franchise-specific tangible assets, and (4) Cooper was economically dependent on Amana. *Id.* The Court addresses each of these factors in turn.

### i. Acquisition of franchise-specific knowledge

The court in *Cooper* noted that "years of effort required to gain specialized skills or knowledge valuable to market the licensed product efficiently" could constitute franchise-specific investments. *Id.* at 270 (quoting *Cassidy*, 944 F.2d at 1144). Cooper demonstrated that its

13

employees invested much time over the years acquiring knowledge about Amana's products, and that this knowledge was not transferrable outside of the franchise. *Id.* (quoting a Cooper sales manager's testimony that he and his sales force learned "exclusive or unique features not generally found in comparable products performing the same purpose in the marketplace").

Here, OTG invested in hiring qualified personnel to manage and promote its Ottogi products. (ECF No. 1 ¶¶ 33, 53.) According to the Complaint, OTG hired these personnel to (1) coordinate Ottogi's North American distribution operations and (2) promote Ottogi products inside grocery markets. (*Id.*) It is unclear from the record if the knowledge acquired by these personnel would be transferrable beyond the alleged franchise. *See Cooper*, 63 F.3d at 270. But in *Instructional Sys.*, 614 A.2d at 144, the court found a franchise-specific investment existed where the franchisee was required to maintain a specified number of sales representatives to promote the franchisor's products. *See also Freedman Truck Ctr., Inc. v. Gen. Motors Corp.*, 784 F. Supp. 167, 175–76 (D.N.J. 1992) (recognizing that investments in training car-service employees could constitute franchise-specific investments when involving distinct market segments (e.g., heavy-duty trucks)); *see also Atl. City Coin & Slot Serv. Co. v. IGT*, 14 F. Supp. 2d 644, 653–54 (D.N.J. 1998) (finding that the franchisee's participation in product demonstrations, training sessions, and customer focus groups constituted franchise-specific investments). Viewing the facts alleged in the Complaint in the light most favorable to OTG, the hiring and maintaining of personnel could constitute a franchise-specific investment. This Court considers OTG's allegations sufficient to establish that OTG acquired franchise-specific knowledge.

        ii.    **Franchise-specific goodwill**

The *Cooper* court found that one of Cooper's most important assets was franchise-specific goodwill. *Id.* The court based its finding on the fact that Cooper invested in promotional items

bearing the Amana name, yellow page and newspaper advertisements of Amana products, in-store demonstrations of Amana products, and the fact that evidence in the record indicated that goodwill accounted for nearly half the value of the Cooper franchise. *Id.* at 271. Furthermore, the court noted that the goodwill produced for Amana products would diminish Cooper's credibility if it began marketing a different product after the termination of their relationship. *Id.* (citing *Instructional Sys.*, 614 A.2d at 144) ("For close to twenty years, [Instructional Systems] has persuaded its customers to choose CCC's system. The goodwill . . . would vanish in the event of a termination.").

Here, OTG has invested heavily in customer relationship management and advertising efforts to promote Ottogi's brand in the eastern United States, which have proved successful. (ECF No. 1 ¶ 22.) Over the span of the Agreement, OTG sold over $132 million in Ottogi's products, allegedly significantly boosting OTG's presence in the region. (ECF No. 1 ¶ 6.) Furthermore, OTG suffered losses in its early years allegedly due to its prioritization of growing a robust distribution network based on brand and customer loyalty. (ECF No. 1 ¶ 24.) OTG claims its ability to serve as a leading North American distributor of products is rooted in its relationships with suppliers, because without reliable partners, OTG cannot fulfill its promise to provide the "highest quality support" in the industry. (ECF No. 1 ¶ 27.) This Court considers these allegations sufficient to establish that OTG generated franchise-specific goodwill in efforts to promote Ottogi's products.

        **iii.**    **Tangible assets**

The NJFPA protects franchise-specific "tangible capital investments, such as 'a building designed to meet the style of the franchise, special equipment useful only to produce the franchise product, and franchise signs.'" *Cooper*, 63 F.3d at 271 (quoting *Instructional Sys.*, 614 A.2d at 145). The court in *Cooper* emphasized that the assets need not be "*entirely* franchise-specific but

15

merely that they were '*substantial*[*ly*] franchise-specific.'" *Id.* (quoting *Instructional Sys.*, 614 A.2d at 141). Based on evidence that Cooper invested in displays for Cooper's showroom bearing the Amana logo, Amana product literature, and Amana demonstration models, the court found that "a reasonable jury could conclude that Cooper's assets were substantially franchise-specific." *Id.* at 271–72.

Here, after the execution of the Agreement, OTG invested in a warehouse, equipment, and inventory to fulfill its obligations to Ottogi. (ECF No. 1 ¶ 5.) Furthermore, unlike industry competitors, OTG maintains an inventory with 300 product lines amounting to over three-million dollars of products to ensure that it can meet its dealer-customers' needs. (ECF No. 1 ¶ 26.) This Court finds that these assets are "substantially" franchise-specific for purposes of this motion. *See Cooper*, 63 F.3d at 271.

        iv.    **Economic dependence**

Dependence on a single supplier does not automatically qualify a distributor for protection under the Act, since then "all exclusive distributors could unilaterally decide to convert their distributorships into franchises." *Id.* (quoting *Cassidy*, 944 F.2d at 1141). But the New Jersey Supreme Court characterizes economic dependence as the most important factor in analyzing the community of interest requirement. *Id.* (quoting *Instructional Sys.*, 614 A.2d at 145). The court in *Cooper* found it consequential that, at the time of termination, 85% of Cooper's revenues were derived from Amana products. *Id.* at 272.

OTG has been the exclusive distributor of Ottogi's products on the East Coast since 2008. (ECF No. 1 ¶ 28.) OTG dedicates the entirety of its resources solely to the promotions and sales of Ottogi products. (ECF No. 1 ¶ 28.) Throughout the course of the Agreement, 100% of OTG's total revenues were attributable to the sale of Ottogi's products. OTG was therefore wholly reliant

on OTG for the entirety of the Agreement, rendering OTG financially vulnerable to Ottogi. This Court finds that, based on OTG's allegations, OTG's economic dependence on its relationship with Ottogi further supports the existence of franchise specificity.

Accordingly, franchise specificity exists because, viewing the facts in the light most favorable to OTG, OTG sufficiently alleged it: (1) obtained franchise-specific knowledge; (2) developed franchise-specific goodwill through its relationship with Ottogi; (3) invested substantially in tangible assets in reliance on its Agreement with Ottogi; and (4) is wholly economically dependent on Ottogi.

### b. Whether investments were required

Having found that OTG made franchise-specific investments, the Court must determine whether OTG sufficiently alleged these investments were made pursuant to an agreement or the nature of the business, in order to establish a community of interest. *Cooper*, 63 F.3d at 269 (citing *Instructional Sys.*, 614 A.2d at 141). In *New Jersey American*, New Jersey American ("NJA") assembled automobile products and sold them in the automotive replacement parts market. *N.J. Am., Inc. v. Allied Corp.*, 875 F.2d 58 (3d Cir. 1989). NJA sued Allied, a supplier of brake linings, alleging that Allied's termination of their relationship violated the NJFPA. *Id.* The court found that NJA presented no evidence that it was required to invest in equipment that could not be used to produce products for firms other than Allied, therefore NJA was not required to undertake substantial tangible investments in Allied's business. *Id.* at 64; *see also Colt*, 844 F.2d at 120–21 (finding a lack of community of interest because the franchise-specific investments were "suggested, not required").

Here, OTG's investments in Ottogi were implicitly required by the Agreement. To uphold its end of the Agreement, OTG invested heavily in warehouse, inventory, advertising, and

personnel to establish and grow Ottogi's brand. (ECF No. 1 ¶ 5.) OTG was specifically founded in 2008 to serve as a distributor for Ottogi's products and has only ever sold Ottogi's products. (ECF No. 1 ¶ 21.) It follows that because OTG made all its investments in reliance on its relationship with Ottogi, these investments were tailored to sell Ottogi products and are not easily transferrable to business ventures outside this relationship.

Accordingly, the Court finds the NJFPA applies, as OTG has sufficiently alleged a franchise relationship.

**B.    Validity of the Forum Selection Clause**

Ottogi argues that the remaining allegations in OTG's Complaint should be dismissed without prejudice because OTG improperly commenced the action in the United States District Court for the District of New Jersey, against the Agreement's valid and enforceable forum selection clause, which mandates that OTG bring all claims in the Superior Court of Los Angeles, California. (ECF No. 12-4 at 12–13.) Ottogi alleges that because OTG filed its claims in an improper forum, those claims should be dismissed pursuant to Rule 12(b)(6). (ECF No. 12-4 at 13.) In opposition, OTG contends that the forum selection clause is invalid because the NJFPA deems forum selection clauses in franchise agreements presumptively invalid in order to protect franchisees. (ECF No. 13 at 7.) Ottogi reiterates in reply that the relationship between the parties in this case is outside of the NJFPA's purview, and the forum selection clause is therefore valid and enforceable. (ECF No. 14 at 9.)

In NJFPA cases, forum selection clauses are "presumptively invalid because they fundamentally conflict with the basic legislative objectives of protecting franchisees from the superior bargaining power of franchisors and providing swift and effective judicial relief against franchisors that violate the Act." *Cadapult Graphic Sys. v. Tektronix, Inc.*, 98 F. Supp. 2d 560, 565

(D.N.J. 2000) (quoting *Kubis & Perszyk Assocs. v. Sun Microsystems*, 680 A.2d 618, 626 (1996)). However, the presumption may be overcome if the franchisor provides compelling evidence that the clause was not imposed unfairly due to its superior bargaining power, such as providing evidence of specific negotiations or concessions made to the franchisee. *Central Jersey Freightliner v. Freightliner Corp.*, 987 F. Supp. 289, 297 (citing *Kubis*, 680 A.2d at 627).

In this case, the Agreement contained a choice of law clause in which the parties stipulated that their contractual relationship would be governed by California law:

> **Governing Law.** This Agreement will be governed by the substantive laws of the State of California (State) applicable to Agreements made and full performed in California by California residents.

(ECF No. 12-1 at 14.7.) The Agreement also included a venue clause in which the parties agreed that any disputes concerning their rights and obligations under the Agreement would be litigated in the state courts of California, Los Angeles County:

> **Venue.** Parties agree that any legal action and any dispute shall be adjudicated in the Los Angeles Superior Court, Los Angeles, California. The parties further agree that the Los Angeles Superior Court shall be the exclusive venue to adjudicate any dispute over the rights and obligations set forth in this Agreement. In the event that the Los Angeles Superior Court declines or refuses to adjudicate a dispute between the parties, the parties agree that any Superior Court in the County of Los Angeles, shall be the proper venue and forum.

(ECF No. 12-1 at 14.11.)

However, because this Court recognizes that the relationship between OTG and Ottogi constitutes a franchise based on the allegations in the Complaint, the forum-selection-clause analysis is within the NJFPA's scope.[6] Therefore, the forum selection clauses between the parties

---

[6] If discovery reveals that the NJFPA is not applicable, the Third Circuit has held that a forum selection clause may be enforced under a Rule 12(b)(6) standard, and dismissal is a permissible means of enforcing a forum selection clause. *Nitterhouse Concrete Prods. v. Dobco Grp., Inc.*, 305 F. Supp. 3d 580, 583 (D.N.J. 2018) (citing *Salovaara v. Jackson Nat. Life Ins. Co.*, 246 F.3d

are "presumptively invalid." *Tektronix, Inc.*, 98 F. Supp. 2d at 565. While Ottogi may overcome this presumption by providing compelling evidence that the clause was not imposed unfairly due to its superior bargaining power, *Central Jersey Freightliner*, 987 F. Supp. at 297, Ottogi does not attempt to overcome this presumption in its motion. It simply insists that because it contends no franchise exists, the forum selection clause is presumptively valid under federal law. (ECF No. 12 at 12–14.) Having found the NJFPA applies at this stage, the forum selection clause is invalid.

## IV.   CONCLUSION

For the reasons set forth above, Ottogi's Motion to Dismiss (ECF No. 12) is **DENIED**. An appropriate order follows.


Dated: March 31, 2025                               */s/ Brian R. Martinotti*
                                                    **HON. BRIAN R. MARTINOTTI**
                                                    **UNITED STATES DISTRICT JUDGE**

---

289, 299 (3d Cir. 2001)). "Federal law presumes forum selection clauses to be valid, but that presumption is overcome where the resisting party shows that enforcement would be 'unreasonable under the circumstances.'" *MacDonald v. CashCall*, Inc., 883 F.3d 220, 232 n.14 (3d Cir. 2018) (quoting *Foster v. Chesapeake Ins. Co.*, Ltd., 933 F.2d 1207, 1219 (3d Cir. 1991)).